UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

Elizabeth Senechal,
        Plaintiff

        v.                                    Case No. 14-cv-186-SM
                                              Opinion No. 2016 DNH 109
Aetna Life Insurance Company,
        Defendant

**O R D E R**

Plaintiff, Elizabeth Senechal, brings suit against Aetna
Life Insurance Company ("Aetna") under the Employee Retirement
Income Security Act ("ERISA), 29 U.S.C. § 1001 et seq.  She
challenges Aetna's decision to terminate long-term disability
benefits provided under an employee welfare plan.  Both parties
have filed motions for judgment on the administrative record,
and, in support, have submitted a joint statement of disputed
material facts.  Each party also submitted a statement of
disputed material facts.  For the reasons that follow, the court
denies both motions for judgment on the administrative record,
and remands the matter for further administrative proceedings
consistent with this order.

**FACTUAL BACKGROUND**

The conclusions reached in this case are heavily rooted in
the factual background, and must be understood in context.  All

of which makes it necessary, or perhaps merely useful, to lay
out the context in greater detail than would ordinarily be the
case.

Elizabeth Senechal is 54 years old.  She worked as an
Assistance Coordinator for ADP Total Source, Inc. ("ADP"),
beginning her employment on May 5, 2009.  In that capacity,
Senechal coordinated medical and travel assistance for ADP's
customers.  Administrative Record ("R.") at D00462.  The
physical demands of the position were light.  Id. at D01437.

ADP provides its employees with a group disability
insurance benefit plan, underwritten by a group accident and
health insurance policy purchased from Aetna (the "Policy").
The Policy designates Aetna as the plan's claim fiduciary under
ERISA, "with complete authority to review all denied claims for
benefits under [the] Policy."  R. at D00029.  The Policy further
provides:

> [Aetna] shall have discretionary authority to determine
> whether and to what extent eligible employees and
> beneficiaries are entitled to benefits and to construe
> any disputed or doubtful terms under this Policy, the
> Certificate or any other document incorporated herein.
> [Aetna] shall be deemed to have properly exercised such
> authority unless [it] abuse[s] [its] discretion by
> acting arbitrarily and capriciously.  [Aetna] has the
> right to adopt reasonable policies, procedures, rules
> and interpretations of this Policy to promote orderly
> and efficient administration.

R. at D00029.  As an ADP employee, Senechal participated as a

beneficiary in the Long Term Disability Plan (the "Plan"), which

was administered and underwritten by Aetna.

**The Plan**

To qualify for long term disability benefits, the Plan

required a covered employee to meet the "test of disability,"

defined by the Policy as follows:

> From the date that you first become disabled and until
> monthly benefits are payable for 24 months[,] you meet
> the test of disability on any date that:
>
> - You cannot perform the material duties of your
>   own occupation solely because of an illness,
>   injury or disabling pregnancy-related condition;
>   and
>
> - Your earnings are 80% or less of your adjusted
>   predisability earnings.
>
> After the first 24 months of your disability that
> monthly benefits are payable, you meet the plan's test
> of disability on any day you are unable to work at any
> reasonable occupation solely because of an illness,
> injury or disabling pregnancy-related condition.

R. at D00047 (emphases in original).  The Plan defines

"reasonable occupation" as "any gainful activity for which you

are or may reasonably become, fitted by education, training or

experience; and which results in, or can be expected to result

in, an income of more than 60% of your <u>adjusted predisability</u>
<u>earnings</u>."  <u>Id</u>. at D00065 (emphasis in original).

The Plan describes circumstances that trigger termination
of an employee's eligibility for long term disability benefits,
including:

- The date you no longer meet the [long term
  disability] test of disability, as determined by
  <u>Aetna</u>;

  ...

- The date you fail to provide proof that you meet the
  [long term disability] test of disability;

  ...

- The date an independent medical exam report or
  functional capacity evaluation does not, in <u>Aetna's</u>
  opinion, confirm you are disabled;

  ...

- The date your condition would permit you to:

  o Work; or

  o Increase the hours you work; or

  o Increase the number or types of duties you
    perform in your <u>own occupation</u>

  but you refuse to do so.

<u>Id</u>. at D00048 (emphases in original).

**Senechal's Medical Conditions**

In March of 2010, Senechal exacerbated a preexisting neck and right upper extremity injury when she lifted a box of bottled water.  She developed severe pain on the right side of her neck that radiated to her right upper arm.  R. at D00428.  A subsequent MRI revealed degenerative disc disease most significant at the C5-C6 interspace, and she was later diagnosed with a herniated disc, cervical spondylosis without myelopathy, and cervicalgia.  Id. at D00431; D00433.

Senechal continued to work for ADP through October 3, 2010, when she stopped working due to pain.  She underwent anterior cervical spine surgery in November of 2010.  But, following surgery, Senechal continued to suffer from degenerative arthritis of her neck and back.  Id. at D00853.  In connection with her recovery from surgery, another MRI was performed on February 2, 2011, to assess a mass on her thoracic spine.[1] Senechal is allergic to the contrast dye frequently used during MRIs, and suffered an anaphylactic shock during the procedure. That event seemingly led to some exacerbation of an underlying asthma condition and Chronic Obstructive Pulmonary Disease. Those conditions also caused her severe joint pain.  Senechal

---

[1]    That mass was determined to be an "artifact."  R. at D00586.

was also diagnosed as suffering from chemical sensitivity syndrome.  Her medical conditions resulted in multiple hospitalizations, and required near constant medication, including prednisone.

Additionally, Senechal either currently suffers from or has suffered from polyarthritis, fibromyalgia, osteoarthritis, peptic ulcer disease, kidney stones, lumbar disc degenerative joint disease, a right hip fracture and reconstructive surgery, right knee arthroscopic surgery, and a traumatic tendon repair of her right foot.  R. at D003085.

**Senechal Applies for Disability Benefits**

On October 18, 2010, Senechal submitted a claim to Aetna for short term disability benefits.  (Aetna was also the administrator of ADP's short term disability plan.)  In support of her claim, Senechal's primary care physician, Dr. Scott Diehl, submitted an Attending Physician Statement in which he noted that Senechal's "primary diagnosis" was "neck pain due to ruptured disc." R. at D00436.  Dr. Diehl further opined that Senechal was not currently able to work at all, or do "any physical activity except walk," but that her prognosis was "fair – good," and that he expected "fundamental changes" in her condition in approximately five to six months.  Id. at D00437.

6

Finally, he indicated that he did not know when Senechal would be able to "return to full duty." Id.

On November 12, 2010, Dr. Diehl completed an Attending Physician Recertification Statement for Aetna.  R. at D00466. He noted that nothing had changed with respect to Senechal's condition, and that she was scheduled to have surgery on November 22, 2010.  Id.  He reiterated that Senechal was unable to work, and he estimated that she would continue to be incapacitated through February of 2011.  Id. at D00467.

Senechal's anterior cervical discectomy and fusion surgery was performed by neurosurgeon Dr. Brian Kwon.  The Aetna Disability Claims Administrator assigned to Senechal's claim spoke with Dr. Kwon on November 17, 2010 and confirmed Senechal's surgery.  Aetna then contacted Senechal to inform her that her claim for short term disability benefits was approved through November 28, 2010.  Id. at D01418.

On November 29, 2010, after confirming with Dr. Kwon's office that Senechal's surgery had occurred, Aetna's claims administrator informed Senechal that approval of her claim for short term disability benefits had been extended through January 3, 2011.  The administrator further informed Senechal that her short term disability claim would expire on January 4, 2011, at

7

which point Aetna would consider transitioning her claim to one
for long term disability benefits.

In January 2011, Aetna transitioned Senechal's claim into
one for long term disability benefits, and assigned the claim to
Disability Benefits Manager Bibi Ally.  By letter dated January
5, 2011, Aetna informed Senechal that she met the definition of
disability set forth in the Plan, and that, pursuant to the
Plan, Aetna would be periodically re-evaluating her eligibility
for benefits.  Id. at D01734.  The letter also informed Senechal
that, if she was still disabled from her own occupation and
eligible for benefits in January 2013, the Plan required that
she "meet a more strict definition of disability," explaining
that after 24 months, the Plan would only pay benefits "if you
are not able to work at any reasonable occupation" because of
disease or injury.  Id. at D01734.

On July 11, 2011, Dr. Kwon completed an Attending Physician
Statement for Aetna.  R. at D003084.[2]  He reported that, as of
May 22, 2011, Senechal was capable of "medium work activity,"
defined as "[e]xerting 20-50 pounds of force occasionally,

---

[2]     There appears to be two sets of documents in the record
bearing Bates numbers D003084 – D003088: one set filed on
September 22, 2014 (relating to Senechal's November 7, 2013,
office visit with Jill Ryan, P.A.), and a second set filed on
June 30, 2015 (relating to Dr. Kwon's July 11, 2011 Attending
Physician Statement).

and/or 10-25 pounds of force frequently, and/or greater than negligible up to 10 pounds of force constantly," and could work for six to eight hours a day, four to five days a week.  Id. at D003085.  The only restriction Dr. Kwon noted was that Senechal should limit reaching overhead.  Id.

About that time, Aetna conducted a follow-up review of Senechal's claim.  The clinical assessment noted that Dr. Kwon had "released this claimant to medium work with limitations in overhead reach," and recommended following-up with Dr. Kwon to determine whether Senechal's capacity to perform "medium work with potential for some limited hours (6-8 hours a day[,] 4-5 days per week)" would allow her to perform light or sedentary work activities for a full 12-hour day.  Id. at D001498. Aetna's clinical assessment further recommended contacting Senechal to discuss her "work release, her status and treatment plan."  Id.

When Aetna contacted Senechal, she stated that she was no longer under the care of Dr. Kwon or Dr. Diehl.  Id. at D001500. She informed Aetna that her new primary care provider was Dr. Katherine Shanahan, and that she was also seeing Dr. William Goodman, a pulmonologist, and Dr. Steven Grandgeorge, who specialized in allergy and immunology.  Id.

On August 18, 2011, Dr. Shanahan completed an Attending Physician Statement for Aetna. R. at D00957. Dr. Shanahan described her primary diagnosis as "severe asthma," with a secondary diagnosis of "spinal cord tumor," and other diagnosis of "neck and back pain." Id. She listed the medications taken by Senechal to treat those conditions, and noted an "impairment from medication effects" as "sedation." Id. Listing Senechal's symptoms as "back/neck pain [and] severe shortness of breath," Dr. Shanahan concluded that Senechal had "no ability to work," and that she was "incapable of minimal activity." R. at D00958.

On October 31, 2011, based on Aetna's review of Senechal's medical information on file, Aetna determined:

> [Senechal] continues [with] severe wheezing and [shortness of breath], and symptoms of emphysema and [COPD]. Recent hospitalization [at the] end of July for [shortness of breath] and need for IV medications to stabilize lung functions and back pain.
>
> [Senechal] remains impaired from ability to sit/type or perform at even sedentary capacity due to continue[d] upper ext. pain and [shortness of breath], easily fatigued [with] any activity/[walking]/light lifting [with] ongoing neck and back pain. Having MRIs every few months to assess mass on thoracic spine - may be shadow - however unclear as [employee] cannot have dye . . . severe reaction when last given.
>
> Also requiring recent hosp[italization] at end of July - remains [with shortness of breath], severe lung [deficits,] [oxygen saturation on room oxygen] drops to 80s at times; Due to these multiple issues with [shortness of breath] and pain, and almost constant

10

> cough – causing [fractured] ribs [–] and steroid use[,]
> unable to perform at sedentary capacity for next 3
> months.

R. at D01547 – 48.  Based on this assessment, Aetna continued to approve Senechal's claim for benefits.  Joint Statement of Material Facts ¶ 38.

## Senechal is Approved for Social Security Benefits

Senechal apparently employed the services of an agency called AllSup to assist with her application for Social Security Disability Insurance ("SSDI") benefits.  Beginning in January of 2011, Aetna tracked AllSup's efforts to assist Senechal with her application.  R. at D001475- D001476.  Aetna continued to monitor the status of Senechal's application.  See id. at D01511, D01519, D01522 – D01529, D01552, D01558.

The Social Security Administration ("SSA") determined that Senechal's "maximum sustained work capacity" was "sedentary," and that she was disabled for purposes of her social security claim as of the date of her 50th birthday, February 1, 2011. Accordingly, she met the medical requirements necessary to qualify for disability benefits, and was deemed eligible for SSDI benefits as of February 1, 2011.

AllSup communicated that determination to Aetna on June 4, 2012.  Id. at D01566 – D01568.  Aetna informed Senechal, by letter dated June 14, 2012, that, because she had been awarded Social Security benefits, her disability benefit payments from Aetna would be offset by those Social Security payments.  Id. at D01779.  And, because the SSA had awarded Senechal retroactive benefits, she would have to reimburse Aetna for its overpayment of benefits during that retroactive period.  Id.  Aetna's payments to Senechal were then reduced until Aetna recovered the overpayment in full.  Id. at D01575.

**January 2013 – "Any Reasonable Occupation" Test of Disability**

The effective date of Senechal's long term disability benefit eligibility was January 3, 2011.  So, as of January 2, 2013, the Plan's more stringent definition of "disability" became applicable, and Senechal's eligibility for benefits continued only if she was unable to work at "any reasonable occupation."

Aetna claim administrator Shirley Heera spoke with Senechal by phone on August 13, 2012.  R. at D01577.  Heera pointed out that the Plan's definition of "disability" would be changing in January 2013, so Aetna would again be requesting Senechal's medical records.  Id. at D01584.  Senechal disclosed that she

was currently seeing Dr. Grandgeorge for her allergies, and Dr. Goodman and Dr. Christine Oliver at Massachusetts General Hospital for pulmonology issues, but was no longer seeing Dr. Moe Zan for rheumatology, or Dr. Terry Ball for orthopedics, because both had concluded that they were unable to help alleviate her symptoms.  Id. at D01580 – D01582.  Senechal further disclosed that Dr. Shanahan had left the area, and her primary care physician was now Dr. Keith Stahl.  Id. at D01582.

Heera and Senechal also spoke about Senechal's daily activities.  Senechal reported that her activities were severely limited by her conditions, because she was "not able to go anywhere" or "be around people" due to her chemical sensitivities.  R. at D01580, D01582.  Heera asked Senechal what she did for entertainment or fun; Senechal responded that she would use her computer a "little bit," watch movies, and "if she was having a really good day," ride on a motorcycle.  Id. at D01582.

On November 18, 2012, Heera again spoke with Senechal by phone.  Heera noted that Senechal was coughing frequently during the call.  During the call, Heera asked Senechal whether she could work at a home-based job.  R. at D01595.  Senechal responded that she could not "due to medication and . . . [and] her constant cough."  Id.

13

Aetna, by letter dated December 31, 2012, again informed Senechal that the Plan's definition of disability would change effective January 3, 2013.  R. at D01791.  Aetna noted that it would be unable to complete its determination of Senechal's continued eligibility for long term disability benefits under the changed definition by January 3, 2013, and so her monthly benefits would continue until Aetna concluded its investigation. Finally, Aetna asked Senechal to provide Aetna with any additional medical or vocational information that she wished Aetna to consider in making the determination.

## Aetna's Receipt of Senechal's Medical Records

Aetna received Senechal's medical records from Dr. Stahl, Dr. Goodman, Dr. Grandgeorge, Dr. Oliver, Dr. Ball and Dr. Zan. Dr. Stahl and Dr. Goodman also provided Aetna with Attending Physician Statements.  A brief summary of those records and statement is set out below.

Dr. Stahl's Attending Physician Statement was completed on November 26, 2012.  He noted that Senechal suffered from "recurrent bouts of dyspnea/wheezing," and had "no ability to work."  R. at D01016.  However, he also indicated that Senechal could work two hours a day, three days a week.  Id.

14

Senechal's medical records from Dr. Zan, a rheumatologist, disclosed that she visited him due to her "sudden onset polyarthritis." R. at D01283. Dr. Zan noted that, during a February 2012 appointment, Senechal looked "very uncomfortable because of the generalized joint pain," and that his exam "shows diffuse tenderness over almost every joint." Id. His notes of an August 2011 visit also indicate that Senechal "looks very uncomfortable" due to her pain. Id. at D01327.

Aetna received Dr. Grandgeorge's medical records on October 23, 2012. His records note Senechal's "complex history," as well as the health problems she encountered when attempting to taper her Prednisone dose. R. at D00422, D00425. Dr. Grandgeorge "presumed asthma," but Senechal's "[w]ork up showed low-normal [Pulmonary Function Tests], negative allergy tests, [and] normal immunoglobulins." Id. at D00422.

On November 1, 2012, Aetna received Senechal's medical records from Dr. Oliver at Massachusetts General Hospital. Dr. Oliver's records from Senechal's June 22, 2012 appointment note Senechal's asthma, indicating concerns regarding "steroid dependence and frequency of severe attacks;" the arthralgias and joint swelling Senechal experienced upon steroid withdrawal; and Senechal's chemical sensitivities. R. at D00628.

15

Dr. Ball, an orthopedist, indicated to Aetna that he only saw Senechal once, on November 28, 2011.  R. at D00637.  His notes from that visit show that Senechal complained of pain "from her neck to her tailbone that is present and constant," but that her postoperative MRI shows "an acceptable decompression with no significant canal stenosis.  Plain x-rays show good graft and instrument position."  Id. at D00638-39.  Dr. Ball stated that he did "not see any surgical indications here," and that the "best option" for Senechal "would be consideration of [a] functional restoration" program.  Id. at D00639.

**Dr. Goodman's Treatment Notes and Attending Physician Statement**

Dr. Goodman began treating Senechal in July 2011 for "evaluation and management of dyspnea since [February 2011] MRI dye infusion."  R. at D01334.  In addition to Senechal's dyspnea, Dr. Goodman also noted that she suffered from joint pain and swelling.  Id. at D01335.  His treatment notes from Senechal's many subsequent outpatient appointments indicate that Senechal suffers from "[s]evere intermittent [shortness of breath]/asthma/possible chemical hypersensitivity," "has highly reactive airways and chemical sensitivities," and an "allergic

process superimposed on some underlying COPD with bronchial
hyperactivity."  Id. at D01303, D01264, D01270.

At Senechal's appointments, Dr. Goodman frequently noted
that she presented with wheezing.  However, he also frequently
noted that Senechal exhibited:

- No obvious use of accessory muscles of respiration.
- Hyperinflation is mild (or not evident).
- Bilateral breath sounds are present and symmetric.
- Significant crackles are not appreciated.
- A prolonged expiratory phase is mild (or not present).

R. at D01241 (10/17/2012); D01248 (7/20/2012); D01255
(5/24/2012); D01262 (4/10/2012); D01269 (3/16/2012); D01289
(12/12/2011); D01301 (11/19/2011); D01312 (10/3/2011); D01323
(8/30/2011).  Dr. Goodman's notes also frequently reference
Senechal's efforts to avoid exposure to the chemicals and
allergens that exacerbated her condition and symptoms, and
indicate that these efforts resulted in an improvement in her
symptoms.  See, e.g., R. at D01242 (October 17, 2012: "Although
she is still troubled, she knows how to more effectively avoid
triggers and has been doing better in general and more active
and independent"), D01250 (July 24, 2012: "Over the past
weeks[,] her improvement might be due to the fact that
construction in her house is settling down, she is more aware of

17

potential triggers in her environment, she is more able to avoid
known triggers in the environment"); D10251 (May 24, 2012:
"[H]as been successful in trying to avoid contact with all
chemicals and perfumes.  The patient tells me that overall
symptoms have been improved since last visit.").

Dr. Goodman's notes reference the intermittent nature of
Senechal's symptoms.  For example, on October 31, 2011, he
recounts a conversation with Dr. Aleena Benerji, a specialist
from Massachusetts General Hospital who was also treating
Senechal, writing:

> I discussed her case with Dr. Benerji by telephone – I
> called her.  She and I reviewed [Senechal's] case and
> her laboratory investigations.  At this point, [Dr.
> Benerji] cannot put together her symptoms and
> syndromes in one clear diagnosis. . . .  She and I
> reviewed [Senechal's] normal IgE, her negative Hsps.
> [Dr. Benerji] also commented on the intermittent
> nature of [Senechal's] symptoms[, which] makes many
> chronic and persistent illnesses unlikely.  This goes
> along with the fact that by the end of my visit today
> although she started out distressed coughing and
> dyspneic, she was more comfortable, smiling and
> speaking loudly and clearly.

R. at D01308.  And, according to Dr. Goodman's treatment notes,
Senechal more often than not reported to him that her breathing
problems did not usually interfere with her activities or

selection of activities.³  See, e.g., id. at D01236;  D01250;

D01258; D01297; D01314; D01319; D01328; D01335.

**Aetna's January 3, 2013 Clinical Assessment**

Following review of Senechal's medical records, Aetna's

file reflects the following clinical assessment, dated January

3, 2013:

> Medical information reviewed supports continued
> functional impairment beyond TC date of 1/3/2013
> through 4/30/2013 and possibly ongoing.  Claimant
> remains symptomatic as related to pulmonary status
> with documented multiple chemical sensitivities
> including perfume, carpeting, pain, cleaning supplies
> used in both public places and residence (own home and
> home of friends), exposure to gasoline fumes led to an
> exacerbation, crafting activity (reports accidentally
> put her thumb with paint into her mouth which led to
> dyspnea, stridor [and] wheezing, visit to ER).
> [Claimant] has not been off Prednisone since [October]
> 2012 and since then has been tapering down from 60
> mg/day to 15 mg/day. On [October 17, 2012], Dr.
> Goodman noted [claimant] does go for walks [and]
> little bit of exercise, diabetes due to polyuria and
> polydipsia could be present given use of prednisone
> with plan for glycosylated hemoglobin during next
> blood draw.  Unconfirmed if recent lab studies have
> been done or outcome.  On [November 18, 2012],
> [disability benefits coordinator] noted [claimant] was
> coughing during entire interview, [claimant] reported
> significantly limited functional capabilities.
> Overall medical presentation would preclude even
> partial [s]edentary level activity.

---

³    On two occasions, Senechal did report to Dr. Goodman that
her breathing problems did not limit her selection and
performance of activities, but she was limited by her
musculoskeletal conditions. See R. at D01335; D01297;

R. at D01607-08.

Following this assessment, Aetna's case file lists the following "next steps" to "address physical impairment" beyond April 30, 2013: (1) conduct an updated phone call with Senechal to discuss daily activities, as well as her current symptoms and medications; (2) obtain medical records and diagnostic tests from Senechal's treating physicians from December 2012 to present; (3) obtain Attending Physician statements from Senechal's treating physicians; and (4) obtain a Capabilities and Limitations worksheet from the disabling provider.  R. at D01609.

**Dr. Goodman's January 2013 Attending Physician Statement**

Dr. Goodman completed an Attending Physician Statement on January 22, 2013, stating that Senechal was "unable to work due to chemical sensitivities and asthma."  R. at D00653.  He also sent a letter to Aetna on January 24, 2013, writing that Senechal was "quite impaired by her hypersensitivity and chemical sensitivity syndrome," which "manifests as shortness of breath and asthma exacerbations."  R. at D01014.  Dr. Goodman indicated that he had attempted to evaluate her on January 22, 2013, but:

> [Senechal] had a terrible adverse reaction to a
> perfume that someone was wearing that she could smell
> . . . upon entering the waiting room.  She had to flee
> and has not been seen today.  This is a demonstration
> of her severe impairment and inability to function
> normally.  I consider her severely functionally
> impaired.  Please take this into consideration as you
> help Elizabeth Binette (Senechal).

Id.[4]

On February 1, 2013, Aetna employee Linda Mohi spoke with

Dr. Goodman's nurse, and asked whether, in Dr. Goodman's

estimation, Senechal could perform sedentary work at home.  Id.

at D01636.  After speaking with Dr. Goodman, the nurse reported

that she "discussed with Dr. Goodman [and] . . . per Dr.

Goodman, patient probably could, yes, return to work full time

[s]edentary . . . work from home."  Id. at D01640.  Following

this discussion, Aetna's file contains the following clinical

assessment:

> Clinician agrees with Dr. Goodman (Pulmo) verbal
> assessment on 1/31/13 for full time work from home,

---

[4]    Dr. Goodman indicated that, because he had been unable to
evaluate Senechal on that date, he completed Aetna's Attending
Physician Statement based on his assessment at Senechal's
October 15, 2012, appointment.  Dr. Goodman's notes from the
October 15, 2012, appointment note that Senechal's symptoms were
improving, and that her "[b]reathing problems do not usually
interfere with activities or selection of activities," that she
was partaking in crafts, and "[e]xercise is routinely performed
in the form of walks outside and even dance."  R. at D01236.  He
further wrote: Senechal is "still troubled, [but] knows how to
more effectively avoid triggers and has been doing better in
general and more active and independent."  Id. at D01242.

>     performing lifting, carrying, pushing, or pulling 10
>     pounds occasionally, sitting most of time, walking or
>     standing for brief periods of time.

Id. at D01647.


On February 2, 2013, Aetna sent a fax to Dr. Goodman,
requesting that he confirm that Senechal could "Work-At-Home,
Sedentary (i.e., lift carry, push or pull 10 pounds
occasionally).  Sedentary work involves sitting most of the
time, and may involve walking or standing for brief periods of
time."  R. at D01019.  Aetna asked Dr. Goodman to check "yes" or
"no" in response.  On February 11, 2013, Dr. Goodman checked
"yes." [5] Id.  The letter was faxed to Aetna on February 21, 2013.
Id. at D01376.

---

[5]   Senechal argues that Dr. Goodman did not say that she could
work full-time.  However, the record does not support her point.
The text of Aetna's request to Dr. Goodman states:

>     In order for us to complete our assessment, we ask
>     that you please provide the following information:
>
>     On 1/31/13 Linda (Jan) Mohi, RN – Inquire for full
>     time Work-At-Home, Sedentary (ie, [sic] list, carry,
>     push or pull 10 pounds occasionally.  Sedentary work
>     involves sitting most of the time, and may involve
>     walking or standing for brief periods of time).
>
>     Stephanie stated if written documentation is requested
>     for this work status, please fax any forms to her
>     attention at [fax number].
>
>     Please signed [sic] that your [sic] agreed your
>     patient can performed [sic]:

**Coventry's Vocational Assessment**

As part of its assessment of Senechal's eligibility for benefits under the "any reasonable occupation" standard, in February 2013, Aetna referred Senechal's file to Coventry Health Care[6] for a vocational assessment for "sedentary home based job[s]."  R. at D00688.

On February 19, 2012, Coventry submitted its "Transferable Skills/Labor Market Analysis" (the "Analysis") to Aetna.  R. at D01020.  The Analysis, performed by Coventry Vocational Rehabilitation Consultant Deborah Lince, suggests that when Lince contacted Senechal to review work history and relevant background information, Senechal "struggled to speak," and was "overcome every few minutes with violent coughing attacks."  Id. Senechal explained to Lince that "she suffers from extreme [a]sthma and recently experienced a reaction to perfume worn by a staff member at her physician's office."  Id.  Lince writes:

> I found the telephonic interview to be challenging, as
> Ms. [Senechal's] coughing was very distracting and
> loud.  It appears she was able to curtail the extreme

_____Yes Or _____NO Mrs. Binnette can Work-At Home, Sedentary

R. at D00686 (emphasis added).

[6]    On August 19, 2012, Aetna entered into a definitive agreement to acquire Coventry.  The acquisition was effective on May 7, 2013.

coughing when speaking about her industrial accident
many years ago, completing many successive sentences
before again being overcome with coughing.

Id. Because of Senechal's "communication difficulties," Lince

decided to limit Senechal's occupation search to sedentary home-

based employment opportunities that did not require speaking.

Id.


Within that framework, Lince identified the following

"occupational alternatives" consistent with Senechal's

transferrable skills and functional limitations: (1) billing

clerk; (2) ticketing clerk; (2) data entry clerk; and (4)

addressor.  Id. at D01024.  Lince then identified five employers

who were "currently hiring for telecommute opportunities for the

above occupations in the national economy."  Id. at D01026.  The

Analysis concluded that it was "reasonable to infer the

identified occupations would offer work from home opportunities

. . . while limiting [Senechal's] speaking tasks to a never

frequency."  Id.


**Aetna Terminates Senechal's Disability Benefits**

By letter dated February 22, 2013, Aetna informed Senechal

that it was terminating her long term disability benefits

effective March 1, 2013, because she was "not totally disabled

from performing any reasonable occupation."  R. at D00697.

Aetna stated that it was relying upon the following documentation as "relevant to our claim decision:"

> (1)  Dr. Goodman's February 11, 2013, "release," which indicated Senechal could "work from home full time in a sedentary position;"
>
> (2)  Dr. Stahl's November 26, 2012 Attending Physician Statement;
>
> (3)  Dr. Shanahan's August 18, 2011 Attending Physician Statement and Capability and Limitation Worksheet;
>
> (4)  Dr. Perry Ball's response to Aetna's request for an Attending Physician Statement, indicating that "he only saw [Senechal] once," and she was "referred for a functional restoration program at Dartmouth Hitchcock Medical Center;"
>
> (5)  Dr. Kwon's July 11, 2011 Attending Physician Statement and Capability and Limitation Worksheet; and
>
> (6)  Coventry's Analysis.

R. at D00696 – D00697.

Aetna's letter referenced Senechal's awarded Social Security Disability Benefits, and noted that Aetna had encouraged Senechal to apply for those benefits because it was required by her Plan, and because being approved for those benefits was advantageous to Senechal.  Id. at D00697.  Aetna further stated:

> At that time we had medical and vocational information which indicated that you were totally disabled and it appeared that you would be eligible for SSD benefits

either for a closed period or for an indefinite
period.

Since that time, we have updated your LTD claim
record, as explained earlier.  We received additional
medical records from your providers.  We have had
these and other medical records reviewed by qualified
medical consultants who have outreached to your
treating physicians to discuss your case.  Your
treating providers agree that you could perform full
time sedentary work.  A Transferrable Skills Analysis
and Labor Market Analysis were completed.  This review
shows that the information that was relied on to
approve your claim for SSD benefits and your initial
LTD benefits differs significantly from the
information we now have concerning your claim.  For
this reason, we have given the fact that you are
receiving SSD benefits little weight in our
determination of whether you are eligible for LTD
benefits under the plan.  While you may still be
receiving SSD benefits, we find that you are no longer
eligible for LTD benefits, as you are no longer
disabled based on the plan definition of Totally
Disabled quoted above.

Id. at D00697 – D00698.

Finally, Aetna explained how to appeal its determination,

noting that Aetna would review any additional information

Senechal wished to submit: "Specifically, you will need to

provide medical information which would support restrictions and

limitations precluding your . . . return to work in any

occupation as defined by the policy."  Id.

**Dr. Goodman's Office Calls Aetna Regarding Claim Termination**

On February 25, 2013, Dr. Goodman's nurse telephoned Aetna and spoke with Shirley Heera.  The file notes from this call show:

> Incoming call from Stephanie, Dr. Goodman['s] office, she said that the [patient] called crying [because] we terminated her claim.  [Stephanie] said since the doctor signed off on the [February 11, 2013 letter,] [patient] was seen in office and doctor felt she is disabled.  I told her to have the doctor submit the record [or] note and the letter[;] we will review the claim, but told her base[d] on the home base[d] release[,] we found her employer [sic] and even PT will meet the wage and minimal talking so have the doctor be specific on what he think [sic] she can do. She reference [sic] the medication [Senechal] is on[;] I told her we do not have a [doctor] disabling her [as a result of] narcotic medication.  She would need to have her doctor submit the record.

R. at D01376.

**Senechal Appeals**

By letter dated March 26, 2013, Senechal submitted a request to appeal the denial of her claim.  R. at D01035.  In her letter, she argued that Aetna's denial was based upon a clinical error: Aetna's benefits coordinator had requested Senechal's medical records from Dr. Goodman using Senechal's former last name, Binette.  According to Senechal, that error resulted in Dr. Goodman faxing incomplete paperwork to Aetna,

and Aetna's subsequent denial of her claim for benefits.[7]
Senechal's letter also discussed her health conditions,
including her multiple hospitalizations, doctors' visits and
prescribed medications, and urged Aetna to request medical
records from new specialists she was seeing, including Dr.
Gerald Hevern, a pain management specialist with Elliot Hospital
Pain Management Group, and Dr. Ruymann, of Mount Auburn
Hospital. Id. at D01036.

Upon receiving notice of Senechal's appeal, Aetna
transferred Senechal's file to Julia Bell, a Senior Appeal
Specialist. Bell spoke to Senechal on April 4, 2013. During
that conversation, Senechal disclosed that she was being treated
by Dr. Stahl, Dr. Goodman, Dr. Oliver and Dr. Hevern, and that
additional medical information was available from them that
would support her appeal. R. at D00715. Bell agreed to delay
consideration of Senechal's appeal until Aetna received the
additional information. Id.

In support of her appeal, Senechal submitted a March 5,
2013, letter from Dr. Goodman. He wrote:

> It is my professional opinion that Elizabeth
> Senechal is not able to work in a reliable fashion on
> a consistent basis inside or outside of her house due
> to her [h]ypersensitivity [s]yndrome and its

---

[7]   The allegation is seemingly unsupported by the record.

associated respiratory symptoms.  In reviewing my records, I see she has had exacerbations and troubles breathing on a frequent yet unpredictable basis over the last year.

She currently finds herself on a high dose of Prednisone to help decrease her respiratory symptoms since an exacerbation that occurred over the past few days.

I have provided you with copies of my medical record[s] in the recent past, but I am adding this letter to supplement the information you already have.

Id. at D01015.

Senechal also submitted office visit notes from Dr. Stahl dated March 24, 2013, in which he wrote that she had presented primarily with "bilateral rib pain she has with coughing, which she states is not unusual for her."  R. at D000728.  Stahl wrote that Senechal's "lung sounds are rhonchorous throughout with bilateral wheezes at apices," and that Senechal had reported she had been coughing up yellow sputum.  Id. at D000728, D00732. During this visit, Senechal's oxygen saturation level was at 100 percent.  Id. at D000730.  Dr. Stahl noted that Senechal was not taking Prednisone, and was taking liquid Roxicent for pain.

Aetna obtained Dr. Hevern's medical records on April 24, 2013.  R. at D00583.  Dr. Hevern's notes from Senechal's April 2, 2013, appointment indicate that Senechal complained of difficulty breathing and rib pain.  R. at D00585.  He further

29

noted that Senechal was in "mild to moderate distress, . . .
demonstrated by her need[] to move around in sitting positions,
standing positions, lying position[,] and at times, holding onto
her ribs, either when she is breathing or laughing."  Id. at
D00586.


**Aetna Requests MES Solutions Physician Review**

    As part of the appeals process, Aetna contracted with two
consultants with MES Solutions to conduct physician reviews: Dr.
Elsie C. Morris, who is board certified in Allergy and
Immunology, Preventative Medicine and Occupational Medicine; and
Dr. Edward Klotz, who is board certified in Internal
Medicine/Pulmonology.


*Dr. Morris's Report*

    Dr. Morris made the following general comment based on her
review of Senechal's medical records: "[t]he medical records
support that [Senechal's] asthma/COPD is not well controlled and
that the claimant has ongoing symptoms."  R. at D00809.


    Aetna requested that Dr. Morris provide a "detailed
description" of Senechal's functional impairment.  Id.  Dr.
Morris reported that Senechal's functional impairment was due to
"her ongoing symptoms related to her asthma/COPD.  She has

chronic wheezing and [shortness of breath]." Id.  Dr. Morris
stated that she had not reviewed Senechal's Pulmonary Function
Test results, but that Senechal's medical records referenced
those results as showing "mild obstruction." Id.  She further
noted: "The medical records support that the claimant is
symptomatic but the only clinical evidence is wheezing
documented on physical exams at various office visits.  There
are no spirometry or pulse oximetry results." Id.

Aetna then asked Dr. Morris to estimate the physical demand
level or work that Senechal could likely perform.  She responded
that Senechal could likely perform sedentary work.  She also
noted that "[t]he claimant is impaired.  Her impairment affects
her ability to perform her job." R. at D00810.  Dr. Morris was
asked whether the limitations imposed by Senechal's treating
providers were "supported by the medical evidence." Id.  Dr.
Morris responded that the medical record she reviewed supported
Senechal's inability to perform her former "light level"
occupation with ADP, writing:

> The claimant does seem to have at this time moderately
> severe asthma which is steroid [dependent].  At various
> visits to her treating physicians she has had wheezing
> on physical exams.  I do feel that the medical records
> support that she now has more [severe] asthma that is
> easily triggered by physical environmental exposures
> such as odors.  Physical activity would be another
> trigger.  The claimant continues to have ongoing
> symptoms.  If her asthma is able to be controlled[,]

she may perform sedentary work.  The medical evidence
does support that the claimant has ongoing wheezing and
shortness of breath.  The wheezing that causes
impairment of her ability to breath and therefore
affects her ability to work.

Id. at D00810 (emphasis added).


Finally, Aetna asked Dr. Morris whether there were "any

physical or cognitive examination findings of any functional

impairment suggesting that the claimant's ability to work has

been directly impacted by an adverse medication effect."  Dr.

Morris responded:

Based on the provided documentation, there are physical
or cognitive examination findings of any functional
impairment suggesting that the claimant's ability to
work has been directly impacted by an adverse
medication effect during the time period from
03/01/2013 through 05/30/2013.

The claimant's original exacerbation of her asthma/COPD
was caused by an allergic reaction to contrast dye
given during the performance of an MRI.  Following this
reaction[,] the claimant continued to have ongoing
wheezing that resulted in a hospitalization.  Post
discharge she continues to wheeze and requires multiple
medicines as well as prednisone.  There have been no
additional reactions documented in the medical records.

Id. at D00811.  Dr. Morris's impairment conclusion was:

"Supports functional impairment for the entire time frame."  Id.

at D00810 - D00811.

*Dr. Klotz's Report*

Dr. Klotz stated that he was asked to evaluate Senechal's functional impairments and medical history:

> in relationship to any occupation, which would be sedentary and with the possibility of her working from home or over the phone. . . .  Despite multiple doctors stating that she has this chemical sensitivity syndrome, I see no reason why the claimant could not perform any occupation with a sedentary physical demand rating particularly if she were able to perform from home.  It would be difficult given the diagnosis of chemical sensitivity for her to perform in an office setting as somebody always will be wearing some fragrance.

Id. at D00816.  He estimated the demand level of work that Senechal could perform as "sedentary for the entire time frame with the caveat that she would need to work from home."  Id.

Dr. Klotz was also asked to assess whether there were "any physical or cognitive examination findings of any functional impairment suggesting that the claimant's ability to work has been directly impact[ed] by an adverse medication effect."  Id. at D00817.  He wrote: "There are no physical or cognitive examination findings of any functional impairment suggesting that the claimant's ability to work has been directly impacted by an adverse medication effect of the medications listed above during the entire time frame."  Id.

**Aetna Denies Senechal's Appeal**

On June 13, 2013, Aetna notified Senechal that her appeal was denied, writing: "we have determined there remains insufficient medical evidence to support your disability."  R. at D00755.  Aetna further explained:

> The records reviewed denote functional impairments due to your ongoing symptoms related to your asthma and COPD.  You have chronic wheezing and shortness of breath.  You have been receiving chronic steroids for this problem, inhaled bronchodilators and inhaled steroids to control your symptoms.  An acute exacerbation caused you to be hospitalized for pneumonia and wheezing.  It is noted that the results of the pulmonary function test results showed mild obstruction.  An extensive workup was completed to determine other causes of wheezing and shortness of breath.  The CT scan of the chest was read as showing some emphysematous changes in the upper lobes.

> The medical records support that you are symptomatic but the only clinical evidence is wheezing documented on physical exams at various office visits.  There were no spirometry or pulse oximetry results.

> The records denote that you require prednisone on a frequent to almost steady basis to keep your asthmatic symptoms under control.  You apparently exercise outside and participate in dance activities.

> Although the records denote that your asthma appear[s] to be sever[e] at this time and is easily triggered by physical environmental exposures such as odors as well as physical activity, there remains a lack of evidence to support an impairment from a sedentary physical demand level.  It has been opined that although you may not be able to perform work in an office environment, you are capable of performing sedentary work as long as the occupation is one that allows you to work from home.

Id. at D00755.  Aetna's decision was final, and not subject to further administrative review.  Id.

According to Aetna's file, the "decision rationale" was as follows: "medical information fails to support impairment from sedentary [occupation] as long as [occupation] is work at home. [Transferable Skills Analysis/Labor Market Analysis] located [occupations] that could be performed at home with limited phone use as well."  R. at D01690.

**Senechal Complains to the New Hampshire Insurance Department**

Following Aetna's denial of her appeal, Senechal filed a complaint with the New Hampshire Department of Insurance, contending that Aetna had improperly requested her medical records using her prior last name, and that Aetna's denial of benefits was improper because three of her physicians had concluded that Senechal was disabled.  R. at D00803.  On June 13, 2013, the New Hampshire Insurance Department asked Aetna to provide "a detailed narrative and timeline explaining what transpired with respect to this complaint."  R. at D00800.

Aetna responded to the Insurance Department's request, citing in support of their determination that Dr. Goodman had found that Senechal was capable of "full time sedentary work at a home based job" in February of 2013.  R. at D00759.  Aetna

also noted that it relied upon medical reviews conducted by MES
physicians in support of its denial of benefits, and, "based on
the reports, we determined that there was a lack of medical
evidence to support an impairment that would have prevented Ms.
Senechal from performing work at any reasonable occupation."
R. at D00760.  Aetna responded further:

> We have reviewed the documentation provided by Ms.
> Senechal's doctors.  Although she has indicated that
> these doctors find her to be disabled, Aetna does not
> rely solely on the recommendations of the doctors.  We
> make our decisions independent of the doctors after
> reviewing the documentation provided to us.

R. at D00761.

After receiving Aetna's response, on July 2, 2013, the
Insurance Department asked Aetna: (1) to "explain the jobs you
have noted in the response, and where [Senechal] can apply"; and
(2) whether "Aetna considered [Senechal's] ability to work while
she is taking the pain medicines she does in order to help with
her medical conditions."  Id. at D00838.

Aetna responded by letter dated July 9, 2013.  While Aetna
did not directly respond to the state's question concerning
where Senechal could apply for the jobs Coventry had identified
in its Analysis, Aetna did identify the employers "noted to be
hiring for telecommute opportunities for the occupations

36

identified in the national economy" by Coventry in its Analysis.
R. at D00835 – D00836.  In response to the state's question
regarding pain medication, Aetna stated:

> [T]here was no medical evidence presented to support
> that her ability to work was directly impacted by an
> adverse medication effect.  There were no physical or
> cognitive examination findings of any functional
> impairment because of an adverse medication effect for
> the period under consideration.

Id. at D00836.


**Senechal Requests that Aetna Reconsider her Appeal**

On December 2, 2013, Senechal, now represented by counsel,
requested that her administrative appeal be reconsidered.
Senechal argued that Aetna had not properly taken into account
the impact of her multiple medications on her functional
ability, and that Aetna had failed to inform her that it
required specificity from her doctors concerning the impact of
these medications.  Id. at D00858 – D00861.  Senechal further
argued that Aetna had not properly taken into account the Social
Security Administration's determination that Senechal was
"permanently and totally disabled and thus entitled to Social
Security Disability Income benefits."  Id. at D00860.

In support of her request that Aetna reopen her appeal,
Senechal submitted two letters from her primary care physician,

Dr. Stahl.  The first, dated June 17, 2013, concerned the
medications Senechal took to manage her conditions.  R. at
D00832.  Dr. Stahl wrote, "[Senechal] does take a variety of
medications which, unfortunately, do cause drowsiness.
Specifically this would involve antihistamines, narcotic
analgesics and muscle relaxers."  Id.  He wrote, "[h]opefully
this statement above adequately addresses the concern about her
ability to have meaningful employment."  Id.  Dr. Stahl later
amended his letter to add that "neurologic side effects are
predominating [with] above medications."  Id.

    Dr. Stahl's second letter, dated November 27, 2013,
concerned his review of the Transferrable Skills Market Analysis
conducted by Coventry.  He wrote:

> While the skills/occupations listed are certainly
> activities which one can do from home, these do not
> adequately address the fact that her medical condition
> precludes her from working consistently and reliably
> on a full-time basis.  Ms. Senechal, as previously
> addressed, suffers from a pulmonary condition which
> remains sporadic, unpredictable and intense resulting
> in oftentimes prolonged period[s] of disability.
> Additionally, she remains unable to sit in one
> position for more than one hour without requiring a
> change.  Finally, the medications used to treat her
> medical condition result in sedation, as well as,
> potentially, impairment in judgment.

Id. at D00857.

In addition, Senechal submitted a report prepared for Dr. Stahl by Dr. Hevern on November 4, 2013.  Dr. Hevern wrote that Senechal reported that she:

> has not been able to sleep in the last month because of discomfort and pain[,] that she paces through nighttime and she catnaps through the day.  Therefore, her symptoms of pain have been made worse, her treatment outcomes have been poor and her response to medicines has been somewhat problematic.  She is reporting now that she is having some cognitive changes and some fatigue with the use of gabapentin, even though she reports feeling a little bit better with that medication. . . .

> . . . .

> . . . She reports that she has been less able to be out and mobile because of these cognitive impacts, and that she has been unable to remember different kinds of tasks associated with her daily living.  On functional review, she remains unemployed and unemployable.

Id. at D00853-54.  On examination, Dr. Hevern noted that Senechal was "alert and oriented at the moment, in acute distress, intermittently pacing and sitting down in my office." Id.  He further indicated that he told Senechal, "because of [her] cognitive changes, she is impaired from doing her daily activities."  Id.

Finally, Senechal submitted records from a November 7, 2013, office visit with Physician Assistant Jill Ryan, of Dartmouth-Hitchcock's Department of Rheumatology, at which it

appears she was diagnosed with osteoarthritis of multiple joints and fibromyalgia.  The record lists the multiple medications prescribed to Senechal.

## Aetna Upholds its Original Appeal Decision

By letter dated January 27, 2014, Aetna responded, stating that it had reviewed the information Senechal had provided, but "the original appeal decision remains unchanged.  From a physical perspective, the additional medical information provided did not contain evidence of impairment to performing [sic] sedentary level work."  R. at D000865.  In response to Senechal's argument concerning the effects of her medications on her ability to function, Aetna stated:

> [T]he submitted medical information referred to Ms. Senechal as being alert during physical examination with no documentation of signs of fatigue i.e. tired appearance, yawning, falling asleep, etc.  Ms. Senechal has consistently been noted to be oriented in all spheres.  There has been no documented mini-mental status examination findings provided for review which assessed her cognition, documentation of cognitive impairment by neuropsychological testing or an inability to follow complex commands.  Although the additional information you provided lists several medications that have been prescribed to Ms. Senechal, neither of her providers have documented any adverse effects to any of her specific medications.

Id. at D00865.  Aetna's file states similarly, but notes that Senechal's claims of cognitive impairment are self-reported:

> There is a lack of medical evidence for impairment to
> function at a lesser level than assessed by the two
> peer review assessments.  The providers have submitted
> additional clinical information citing adverse
> medication effects.  The report of cognitive impairment
> and fatigue are self-reported symptoms.  The claimant
> has been noted to appear alert during the physical
> examinations with no documentation of signs of fatigue.

Id. at D01699.[8]


Aetna also rejected Senechal's argument regarding its

purported failure to take into account the Social Security

Administration's benefits approval, stating that its claim

determination letter had acknowledged that Senechal was approved

for these benefits.  Aetna stated:

> It was further concluded that the information that was
> relied upon to approve her claim for [Social Security
> Disability] benefits and the [Long Term Disability]
> benefits differed significantly from the information
> contained in your client's claim file and for that
> reason, the fact that she was approved for SSD
> benefits was given little weight in determining
> whether she was eligible for [Long Term Disability]
> benefits under her plan.

Id. at D00865.

---

[8]    Aetna's file references a "Peer Review Addendum" completed
by Dr. Morris, dated December 17, 2013, where "Reviewer found no
medical evidence for impairing medication effects other than
previously noted."  R. at D01699.  However, neither party
provides a citation to this document, and it seems to be missing
from the record.

This action followed.  Senechal asserts three claims for relief: first, a claim that Aetna violated ERISA by terminating her long term disability benefits; second, a breach of fiduciary duty claim; and third, a claim for attorney's fees and costs pursuant to 29 U.S.C. § 1132(g).  Senechal has moved for summary judgment on her claim that she was wrongfully denied benefits.  Aetna has moved for judgment on the record as to all claims.

**STANDARD OF REVIEW**

**I.   Generally**

When a case involves the denial of ERISA benefits, "the summary judgment analysis . . . differs from the ordinary summary judgment inquiry."  Gross v. Sun Life Assur. Co. of Canada, 734 F.3d 1, 16 (1st Cir. 2013).  "In these cases, 'where review is based only on the administrative record before the plan administrator and is an ultimate conclusion as to disability to be drawn from the facts, summary judgment is simply a vehicle for deciding the issue.'"  Id. (quoting Orndorf v. Paul Revere Life Ins. Co., 404 F.3d 510, 517 (1st Cir. 2005)).  Therefore, "[t]he non-moving party in an ERISA benefits

case is . . . not entitled to the usual inferences in its
favor." Id. at 16-17 (citations omitted).

To determine the standard of review "applicable to a claims
administrator's denial of benefits," the court must "peruse the
plan documents." McDonough v. Aetna Life Ins. Co., 783 F.3d
374, 379 (1st Cir. 2015) (citation omitted).  "A challenge to a
denial of benefits is to be reviewed de novo 'unless the benefit
plan gives the administrator or fiduciary authority to determine
eligibility for benefits or to construe the terms of the plan.'"
Id. (quoting Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101,
115 (1989)).  "[W]here the plan documents grant the claims
administrator full discretionary authority, the decision is
reviewed for abuse of discretion." Id. (citing Firestone Tire,
489 U.S. at 111, and Colby v. Union Sec. Ins. Co. & Mgmt. Co.
for Merrimack Anesthesia LTD Plan, 705 F.3d 58, 61 (1st Cir.
2013)).

Both parties agree that abuse of discretion review applies.
In these circumstances, our court of appeals instructs:

> A court that undertakes abuse of discretion review in
> an ERISA case must determine whether the claims
> administrator's decision is arbitrary and capricious
> or, looked at from another angle, whether that
> decision is reasonable and supported by substantial
> evidence on the record as a whole. See [Colby, 705
> F.3d] at 61.  Although this is a deferential metric,
> it is not without some bite. See id. at 62 (noting

that "there is a sharp distinction between deferential
review and no review at all"); see also Conkright v.
Frommert, 559 U.S. 506, 521 (2010).

McDonough, 783 F.3d at 379.  "As the First Circuit has

explained, '[a]pplying a deferential standard of review does not

mean that the plan administrator will prevail on the merits.  In

order to withstand scrutiny, the plan administrator's

determinations must be reasoned and supported by substantial

evidence.' In other words, the administrator's determinations

'must be reasonable.'"  Tracia v. Liberty Life Assurance Co. of

Boston, No. CV 13-13248-JGD, ___ F. Supp. 3d ___, 2016 WL

552463, at *14 (D. Mass. Feb. 10, 2016) (quoting Colby, 705 F.3d

at 62 (internal quotation marks and citations omitted)).


## II.  Conflict of Interest

Where, as here, the plan administrator is responsible both

for evaluating benefit claims and paying those benefits, a

structural conflict of interest exists.  See McDonough, 783 F.3d

at 379.  "The presence or absence of a structural conflict –

where the plan administrator both makes eligibility

determinations and pays out benefits – is a relevant factor to

be considered in an ERISA review."  Al-Abbas v. Metropolitan

Life Ins. Co., 52 F. Supp. 3d 288, 295 (D. Mass. 2014)

(citations omitted).  "While the existence of such a structural

conflict does not alter the standard of review, it is a factor

44

that a court may draw upon to temper the deference afforded to the claims administrator's decision." <u>McDonough</u>, 783 F.3d at 379 (citing <u>Colby</u>, 705 F.3d at 62).  "[T]he significance of the factor will depend upon the circumstances of the particular case."  <u>Metro. Life Ins. Co. v. Glenn</u>, 554 U.S. 105, 108 (2008).

> The conflict of interest at issue . . . should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an insurance company administrator has a history of biased claims administration.  It should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits.

<u>Id</u>. at 117 (internal citations omitted).  In light of the above, our court of appeals has instructed: "courts are duty-bound to inquire into what steps a plan administrator has taken to insulate the decisionmaking process against the potentially pernicious effects of structural conflicts."  <u>Denmark v. Liberty Life Assur. Co. of Boston</u>, 566 F.3d 1, 9 (1st Cir. 2009).  As the claimant, Senechal "bears the burden of showing that the conflict influenced [the administrator's] decision."  <u>Cusson v. Liberty Life Assur. Co. of Boston</u>, 592 F.3d 215, 225 (1st Cir. 2010) (abrogated on other grounds by <u>Montanile v. Bd. of</u>

Trustees of Nat. Elevator Indus. Health Benefit Plan, 136 S. Ct. 651 (U.S. 2016)).

## DISCUSSION

## I.   Weight to be Ascribed to the Conflict of Interest

Senechal does not argue that Aetna failed to take steps to insulate its decisionmaking process from the conflict's effects. And, the record demonstrates that Aetna has in place safeguards designed to ensure that the Plan will be administered without bias, including: (1) "walling off" its business units to ensure that the claims department and appeals unit are separate from Aetna's financial underwriters and other employees with interests in Aetna's finances; (2) maintaining a separate appeals unit from the claims department, so that the appeal unit independently assesses the reasonableness of a claims determination; and (3) ensuring that employees who are making claims decisions have no financial or professional incentive to admit or deny claims.

"[T]hese procedural safeguards do not minimize the structural conflict 'to the vanishing point,'" and "the structural conflict will remain a factor weighing in favor of [Senechal's] position." Tebo v. Sedgwick Claims Mgmt. Servs., Inc., 848 F. Supp. 2d 39, 54 (D. Mass. 2012). However, measures

such as those taken by Aetna are "sufficient to limit the weight accorded to the structural conflict." <u>Tracia</u>, 2016 WL 552463, at *15.

Senechal argues that the manner in which Aetna conducted its review establishes that Aetna's determination was influenced by the conflict.  More specifically, she points to the fact that Aetna assigned Senechal's vocational analysis to Coventry, a company wholly owned by Aetna since August 19, 2012.[9]  She also contends that Aetna failed to initially provide a complete administrative record to the court, omitting "highly relevant medical documents helpful to Ms. Senechal."  Pl.'s Br. at 5.  Finally, she points to Aetna's failure to credit the SSA's award of disability benefits.

The conflict theory is weak in this case, but it does not matter, because Aetna abused its discretion when it denied

---

[9]     Senechal also hints that the MES Solutions physicians Aetna consulted were not "completely disinterested from matters relating to Aetna," (pl.'s br. at 6) but presents no factual support for her proposition.  Indeed, the facts in the record contradict the claim: both Dr. Morris and Dr. Klotz certified that they lacked any incentive – financial or otherwise – to offer an opinion based on anything other than their professional assessment of the medical information provided.  R. at D00811, D00817.  "To affect the standard of review, . . . a conflict of interest must be real."  <u>Leahy v. Raytheon Co</u>., 315 F.3d 11, 16 (1st Cir. 2002).  "A chimerical, imagined, or conjectural conflict will not strip the fiduciary's determination of the deference that otherwise would be due."  <u>Id</u>.

Senechal long term disability benefits.  "Therefore, it is not necessary to determine whether or to what extent [Aetna's] conflict of interest was a factor in that decision." Tracia, 2016 WL 552463, at *15 (citing in support Young v. Aetna Life Ins. Co., ___ F. Supp. 3d at ___, 2015 WL 7194812, at *19 (D. Mass. Nov. 16, 2015), where the court "[declined] to delve into an examination of the defendant's conflict of interest where court concluded, 'without considering this additional factor[,]' that the defendant abused its discretion by failing 'to provide a principled, substantiated review [of plaintiff's claim] as mandated by ERISA'.").

## II.  **Aetna's Decision to Terminate Benefits**

### A. Aetna's Reliance on Medical Opinions

Senechal's original disability claim was based on her herniated disc, with degeneration of cervical spine cervicalgia. Based on the court's review of the record, Aetna's determination that Senechal's herniated disc does not qualify her as "disabled" under the Plan's currently applicable definition was well-reasoned, and clinically supported.  The same cannot be said, however, for Aetna's determination regarding Senechal's asthma and chemical sensitivities-related maladies.  That determination is problematic largely because the medical opinions Aetna purports to rely upon in support are either

48

themselves internally inconsistent or simply do not support
Aetna's determination.

   *(1)  Dr. Goodman's February 11, 2013 Response*

   The clearest example is Aetna's continued reliance on Dr.
Goodman's February 11, 2013, response to Aetna.  Almost
immediately after agreeing that Senechal could perform full-time
sedentary work from home (i.e., checking a "yes" box on a form),
and after having had an opportunity to contemporaneously examine
Senechal, Dr. Goodman retracted his statement.  Indeed, he
contacted Aetna multiple times to ensure that his timely
conclusions were understood.  See R. at D01376, D01015.  But for
reasons unexplained, Aetna ignored the contemporaneous
conclusions and steadfastly continued to credit Dr. Goodman's
February 11, 2013, form response.  For example, Aetna's response
to the New Hampshire Department of Insurance actually cites Dr.
Goodman's February 11, 2013, response in support of its
determination.  R. at D00759.  Aetna also relies upon Dr.
Goodman's February 11, 2013, response in its brief as support
for its denial of benefits.  Def.'s Br. at 6.

   Aetna has not meaningfully explained why it determined that
Dr. Goodman's February 11, 2013, form response remains reliable,
while his later, contemporaneous conclusions are "replete with

unsupported conclusory statements." Def.'s Br. at 8. Dr.
Goodman's initial response to Aetna was of course second-hand,
made through one of his nurses, and followed-up by his February
11, 2013, "yes" check mark on Aetna's form. At the time of Dr.
Goodman's form response, Aetna knew that he had not had the
opportunity to examine Senechal in nearly five months. At her
most recently scheduled appointment, Senechal suffered an
"adverse reaction to a perfume that someone was wearing" in the
waiting room, and had to leave Dr. Goodman's office. R. at
D01014. Given those facts, as well as Aetna's failure to
meaningfully proffer an explanation, Aetna's continued heavy
reliance on Dr. Goodman's February 11, 2013, form response in
support of its determination cannot be characterized as
reasonable.

>     (2)  *Attending Physician Statements of Dr. Stahl and Dr.*
>          *Shanahan*

     Aetna's also relies upon Dr. Stahl's November 26, 2012,
Attending Physician Statement, wherein he indicates that
Senechal has no ability to work, but, contrarily, also indicates
that Senechal can work two hours a day, three days of week.
Aetna's reliance upon that plainly inconsistent Statement as
support for its determination is also puzzling, and Aetna fails
to provide any meaningful explanation as to how that
contradiction was resolved and how such a contradictory medical

opinion Statement supports its determination that Senechal could work from home, full-time.

Aetna's reliance on Dr. Shanahan's August 11, 2011, Statement is puzzling as well.  That document, which describes Senechal's primary diagnosis as "severe asthma," notes her "severe shortness of breath" and "regression," and indicates that Senechal has "no ability to work," would not seem to support a determination that Senechal could perform sedentary work from home.[10]  R. at D00957 – D00960.

### (3)  Dr. Stahl's and Dr. Goodman's Response to Coventry's Analysis

Aetna further defends its determination by arguing that neither Dr. Stahl nor Dr. Goodman addressed how their findings

---

[10]  Aetna now suggests that Dr. Shanahan's Statement supports its determination that Senechal's herniated disc diagnosis did not prevent her from performing sedentary work at home.  Def.'s Br. at 5.  That makes more sense, since Dr. Shanahan did indicate that Senechal could perform "light walking" and "light lifting."  R. at D00960.  However, ignoring the fact that Aetna failed to previously explain that reasoning to Senechal, Aetna cannot now cherry pick those aspects of Senechal's medical records that support its determination, while simultaneously ignoring those aspects which support her disability claim.  See, e.g., Petrone v. Long Term Disability Income Plan for Choices Eligible Employees of Johnson & Johnson & Affiliated Companies, 935 F. Supp. 2d 278, 293 (D. Mass. 2013) ("[T]he existence of contradictory evidence does not, in itself, make the administrator's decision arbitrary,' but the administrator cannot simply ignore contrary evidence, or engage with only that evidence which supports his conclusion.")  (quoting Vlass v. Raytheon Employees Disability Trust, 244 F.3d 27, 30 (1st Cir. 2001)) (additional citation omitted).

rendered Senechal unable to perform any sedentary occupation, including the four positions identified in Coventry's vocational analysis.  That argument is flatly contradicted by the record: Dr. Stahl submitted a letter to Aetna, dated November 27, 2013, in which he stated that he had reviewed the Analysis, and that it did not "adequately address the fact that [Senechal's] medical condition precludes her from working consistently and reliably on a full-time basis."  R. at D00857.  He continued:

> Ms. Senechal, as previously addressed, suffers from a pulmonary condition which remains sporadic, unpredictable and intense[,] resulting in oftentimes prolonged period of disability.  Additionally, she remains unable to sit in one position for more than one hour without requiring a change.  Finally, the medications used to treat her medical conditions result in sedation as well as, potentially, impairment in judgment.

Id.  And, Dr. Goodman wrote to Aetna:

> It is my professional opinion that Elizabeth Senechal is not able to work in a reliable fashion on a consistent basis inside or outside of her house due to her [h]ypersensitivity [s]yndrome and its associated respiratory symptoms.  In reviewing my records, I see she has had exacerbations and troubles breathing on a frequent yet unpredictable basis over the last year.

R. at D01015.

*(4)  MES Physician Reports*

Finally, Aetna's relies on the independent peer review reports of the MES physicians, Dr. Morris and Dr. Klotz. However, one of those reports does not support Aetna's determination.  Dr. Morris writes: the "medical records support that her asthma/COPD is not well controlled and that the claimant has on-going symptoms."  R. at D00809 (emphasis added). She then writes that Senechal is capable of performing sedentary work "[i]f her asthma is able to be controlled."  Id. at D00810 (emphasis added).  Given Dr. Morris's expert opinion that Senechal cannot perform sedentary work unless and until her asthma is controlled – and, she indicates, it currently is not – her report does not, in fact, support Aetna's determination.

In Aetna's response to Senechal's appeal, Aetna wrote, "It has been opined that although you may not be able to perform work in an office environment, you are capable of performing sedentary work as long as the occupation is one that allows you to work from home."  Exactly who was "opining" is not entirely clear.[11]  Based on this record, it cannot have been Dr. Goodman,

_____

[11]    Aetna's failure to specifically identify the medical expert so "opining" is seemingly contrary to its internal policies, which require that appeal letters "provide for the identification of the medical . . . experts whose advice was relied on in making the determination."  R. at D003134.

Dr. Stahl, or Dr. Morris.  Presumably Aetna is referring to Dr.
Klotz, as he was seemingly the only medical professional Aetna
consulted who opined without qualification that Senechal was
capable of performing full-time sedentary work at home.  While
it is not "for a court to determine how much weight" Aetna
should have accorded Dr. Klotz's opinion in its overall
decision, Gannon v. Metro. Life Ins. Co., 360 F.3d 211, 214 (1st
Cir. 2004), still, Aetna cannot selectively focus on evidence
undermining Senechal's claim while failing to address
substantial contrary medical evidence.  See Cowern v. Prudential
Ins. Co. of Am., 130 F. Supp. 3d 443, 465 (D. Mass. 2015)
(finding insurer's failure to address conflicting evidence and
rely selectively on only those portions of physician's opinion
that supported determination was arbitrary and capricious)
(citing Winkler v. Metro Life Ins. Co., 170 Fed. Appx. 167, 168
(2d Cir. 2006), for the proposition that: "An administrator may,
in exercising its discretion, weigh competing evidence, but it
may not ... cherry-pick the evidence it prefers while ignoring
significant evidence to the contrary.")).

   The majority of the medical opinions Aetna purportedly
relied upon in support of its determination to terminate
Senechal's disability benefits do not actually support its
determination.  Aetna seemingly either ignored conflicting

evidence within those opinions or misread the opinions.  Cf.,
Petrone v. Long Term Disability Income Plan for Choices Eligible
Employees of Johnson & Johnson & Affiliated Companies, 935 F.
Supp. 2d 278, 294 (D. Mass. 2013) ("The Defendant correctly
argues that it owes no special deference to [claimant's]
attending physicians.  But it is an abuse of discretion to
ignore their evidence entirely." (citing Love v. Natl. City.
Corp. Welfare Benefits Plan, 574 F.3d 392, 397–98 (7th Cir.
2009), for the proposition: "While plan administrators do not
owe any special deference to the opinions of treating
physicians, they may not simply ignore their medical conclusions
or dismiss those conclusions without explanation.") (internal
citations omitted); see also Al-Abbas, 52 F. Supp. 3d at 297
("Mischaracterization of evidence can  . . . justify a remand
for further review.) (citing Buffonge v. Prudential Ins. Co. of
Am., 426 F.3d 20, 29 (1st Cir. 2005).

     While arbitrary and capricious review is deferential,
Aetna's questionable treatment of the medical opinions in the
record is sufficient to undermine the integrity of the claims
determination process.  See McCarthy v. Commerce Grp., Inc., 831
F. Supp. 2d 459, 480 (D. Mass. 2011) ("Under a deferential
standard, procedural irregularities constitute an abuse of
discretion when they are 'serious,' have a 'connection to the

substantive decision reached, and call into question the
integrity of the benefits-denial decision itself.'"  (quoting
Bard v. Boston Shipping Ass'n, 471 F.3d 229, 244 (1st Cir.
2006)).

   *B. Aetna's Consideration of Impact of Senechal's Medication*

   Senechal also argues that Aetna abused its discretion by
failing to adequately consider the impact of Senechal's
medication on her ability to perform full-time sedentary work.
Aetna responds that it did reasonably consider whether
Senechal's medications actually rendered her functionally
impaired from being able to work.  According to Aetna, Senechal
failed to submit medical evidence establishing that her
medications actually caused her to suffer drowsiness and
cognitive impairment, but instead submitted evidence that her
medications can generally cause drowsiness and cognitive
impairment.

   While this is perhaps a closer call, it cannot be disputed
that Senechal is heavily medicated, or that there exists medical
evidence in the record establishing that some of her medications
cause sedation.  See, e.g., R. at D00857.  There is also
evidence in the record that, in November 2013, Senechal reported
experiencing "some cognitive changes and some fatigue" due to

her medications.  Id. at D00854.  However, Aetna correctly
points out that the majority of the medical evidence and reports
indicate that Senechal is "oriented in all spheres" and alert
during physical examination.  See, e.g., R. at D00854, D00738,
D00724, D00675, D01248.

Aetna's "decision must be upheld if it is reasoned and
supported by substantial evidence.  Evidence is substantial if
it is reasonably sufficient to support a conclusion, and the
existence of contrary evidence does not, in itself, make the
administrator's decision arbitrary."  Gannon, 360 F.3d at 213
(internal citations omitted).  Aetna's consideration of the
impact of Senechal's medication on her ability to work may not
have risen to the level of an abuse of discretion, but no
matter.  Since the case will be remanded for administrative
reconsideration of claimant's entitlement to long term
disability benefits, the parties will have the opportunity to
develop the record and fully consider the issue.

   C. Aetna's Reliance on Coventry's Analysis

   As mentioned above, Senechal argues that Aetna's reliance
on Coventry's Analysis was improper.  First, Senechal argues
that Aetna essentially had the Analysis performed "in-house,"
because Coventry Health Care was owed by Aetna as of August 19,

2012, the date of the Merger Agreement between the two companies.  As a result, Senechal argues, the Analysis was "performed with a heavy hand."  Pl.'s Br. at 6.  Aetna points out that its acquisition of Coventry was not effective until May 7, 2013, or months after Coventry issued Senechal's Analysis in February 2013.  Therefore, Aetna argues, when Coventry performed the Analysis, Coventry and Aetna were two "wholly separate" companies.

Senechal has not set forth sufficient evidence establishing that, as of the date Coventry performed the Analysis, Aetna's and Coventry's financial interests were so aligned that Coventry had a financial stake in the outcome of Aetna's claims determination.  In other words, Senechal has not sufficiently demonstrated that Coventry had any incentive to issue an Analysis that was favorable to Aetna.  However, for argument's sake, the court will assume that Coventry's and Aetna's interests were aligned.  Even so assuming, Senechal has not sufficiently established that Coventry's Analysis was, in fact, biased or unreliable.

Senechal argues that there is "no objective basis" for Coventry's conclusion that a "reasonable occupation actually exists that would allow an employee to work full time exclusively from home without ever having to speak."  Pl.'s Br.

at 10.  As further evidence of bias, Senechal points to
Coventry's failure to indicate whether the employers identified
in its Analysis were indeed hiring, and that Aetna indicated to
her that occupations identified within the Analysis "exist
within a 50 mile radius of your home," but lacked any factual
basis for the statement.  Id. at 11.

As Aetna correctly points out, the Plan does not require
Aetna to find or guarantee a claimant employment in order to
conclude that a claimant is not disabled from performing "any
reasonable occupation."  More critically, Senechal presents no
factual evidence in support of her argument that Coventry's
vocational conclusions are merely "spectral."  Pl.'s Br. at 11.
Finally, Senechal has not pointed to any evidence establishing
that Coventry's Analysis failed to consider Senechal's work
restrictions and limitations, as indicated by Aetna.  Indeed,
Coventry further limited its vocational analysis to jobs that
did not require speaking after Lince experienced Senechal's
frequent, violent coughing during her phone interview.

Of course, whether Senechal is, in fact, capable of
performing sedentary work full time from home is a separate
issue, and one that must be revisited.  However, in light of
Aetna's initial determination that Senechal was capable of

performing sedentary work from home, Aetna's reliance on
Coventry's Analysis was not arbitrary and capricious.

### D. Aetna's Consideration of Senechal's SSA Award

Senechal's argument concerning the SSA decision is not
entirely clear.  She seems to be making the argument that Aetna
failed to properly account for the SSA's award of benefits to
her in its own determination.  To the extent that is her
argument, it is unsupported by either precedent or the record.

As a preliminary matter, Aetna did address Senechal's SSDI
award in its initial denial letter on February 22, 2013.  As set
forth above, Aetna acknowledged Senechal's award, and indicated
that its review of recent medical records "shows that the
information that was relied on to approve your claim for SSD
benefits and your initial LTD benefits differs significantly
from the information we now have concerning your claim.  For
this reason, we have given the fact that you are receiving SSD
benefits little weight in our determination of whether you are
eligible for LTD benefits under the plan."[12]  R. at D00698.  What

_____

[12]    Senechal does make a valid point when she asks how Aetna
could have made such a comparison without examining the SSA
determination.  Pl.'s Br. at 14.  However, in the court's view,
Aetna's explanation for the discrepancy is plausible.  <u>See</u>
Affidavit of Julia Bell ¶ 19 (document no. 19).  And, that
discrepancy alone is not sufficient to compel the conclusion

those significant differences are is unclear, but at least an explanation was offered.  Upon remand, the issue may be developed.

Moreover, Senechal did not provide Aetna with a copy of the SSA decision and file until – at the earliest – December of 2013.  Throughout the claims determination process, Aetna repeatedly urged Senechal to provide it with information that would support her claim.  As Aetna correctly points out, Senechal bears the burden of establishing that she met the Plan's test of disability.  See Morales-Alejandro v. Med. Card Sys., Inc., 486 F.3d 693, 700 (1st Cir. 2007)  ("A claimant seeking disability benefits bears the burden of providing evidence that he is disabled within the plan's definition.)

However, even if Senechal had provided Aetna with the information, it is well-settled that a Social Security Administration decision is not binding on disability insurers. See, e.g., Pari-Fasdano v. ITT Hartford Life & Acc. Ins. Co., 230 F.3d 415, 420 (1st Cir. 2000).  As our court of appeals has explained, that is because "[t]he criteria for determining eligibility for Social Security disability benefits are substantively different than the criteria established by many

---

that Aetna abused its discretion with respect to its treatment of the SSA determination.

insurance plans." <u>Id</u>.  So it is here.  Upon receiving and
reviewing Senechal's SSA decision and file, Aetna's explanation
as to why its disability determination differs from the SSA's
determination is sufficiently rational:  the SSA's determination
that Senechal was "disabled" was based largely on the fact of
Senechal's age; Aetna's analysis does not consider such a factor
as decisive.  <u>See</u> Affidavit of Julia Bell ¶¶ 14-18 (document no.
19).

For these reasons, and for the reasons stated in Aetna's
Memorandum in Support of its Motion for Summary Judgment,
Senechal's arguments concerning Aetna's consideration of the SSA
determination are without merit.

## III. <u>Remedy</u>

The Court of Appeals for the First Circuit "has held that
the variety of situations is so great in ERISA review that the
court must have considerable discretion to craft a remedy after
finding a mistake in the denial of benefits." <u>Buffonge</u>, 426
F.3d at 31 (1st Cir. 2005) (internal quotations omitted).  In
this case, given the questionable administrative analysis, a

remand for administrative reconsideration of Senechal's claim
for long-term disability benefits is appropriate.

"Considering the record as a whole," Aetna's treatment of
the medical opinions in the record "fails arbitrary and
capricious review for essentially procedural reasons."  <u>Al-
Abbas</u>, 52 F. Supp. 3d at 298.  However, the court cannot
conclude as a matter of law that Senechal is entitled to
benefits.  "Generally, where the court 'cannot say with
assurance that [the claims administrator] denied [the claimant]
benefits to which [he] was entitled,' but still has doubts about
the justification for the claims administrator's decision, a
remand is the appropriate remedy."  <u>Tracia</u>, 2016 WL 552463, at
*19 (quoting <u>Gross</u>, 734 F.3d at 27) (additional quotations
omitted).  Accordingly, both parties' motions for summary
judgment are denied, and the matter is remanded for
administrative reconsideration of claimant's entitlement to long
term disability benefits.

## CONCLUSION

For all the reasons stated herein, Senechal's Motion for
Judgment on the Administrative Record (document no. 58) is
**DENIED**, and Aetna's Motion for Judgment on the Administrative
Record (document no. 64) is **DENIED**.  This case is remanded to

the Aetna claims administrator for proceedings consistent with

this order.

        **SO ORDERED.**

                                               Steven J. McAuliffe
                                               United States District Judge

June 29, 2016

cc:  Francis G. Murphy, Jr., Esq.
     Byrne J. Decker, Esq.
     Kenneth J. Kelly, Esq.
     Lori A. Medley, Esq.